Good morning, Judge Traxler, Judge Diaz, and Judge Harris, Charles Cooper, for the appellants in the case Virginia Uranium et al. The issue in this case is whether Virginia's statutory ban on uranium mining is preempted by the Atomic Energy Act, and the law governing that issue was established by the Supreme District case. That case held that the Act established a system of dual regulation of the nuclear power industry, and that questions of preemption turn on the purpose of the state law at issue. In that case, it was a moratorium on construction of new nuclear power plants. The Court relied primarily on Section 2021K, the provision that is most at heart in this case, as well, and it said that the Congress had permitted the states to regulate nuclear power, but only for purposes other than protection against radiological or radiation hazards. And so the Federal Government had occupied the entire field of radiation hazards in this area. The Court concluded- In what area? They had occupied the entire field of radiological hazards when it comes to building nuclear power plants? No, Your Honor, in the nuclear energy, yes, Your Honor, nuclear energy. In the nuclear energy field? Yes. So states could still regulate radiological safety in other fields? Well, they couldn't regulate anything dealing with the materials identified in 2021. That is, source materials, by-product materials, or special nuclear materials. Those are the- and they're defined. And of course, by-product materials, which is what this case is all about, dealing with the by-products of the milling process and the extraction process, tailings in particular, and the storage of tailings. So that is clearly an area that is within that area occupied entirely by the Federal Government. I'm sort of getting at- I remember the state saying, sort of, if we view the field very, very broadly as radiological safety, you know, does that mean states can't regulate x-rays, the safety of x-rays in their states because they involve- No, Your Honor. X-rays are not within the definition of by-products. And they're certainly not within the definition of source material or special nuclear material. But the subject matter of this case, which is milling and tailings management, those are clearly at the core of the radiation safety hazards that it was Congress's intent to reserve the entire field for the Federal Government. And so the Court concluded in PG&E that a state moratorium on nuclear construction grounded in radiation safety concerns falls squarely within that prohibited field. The Court went on to say that, well, in that particular case, actually, there was a non-safety reason based- aimed at economic considerations, not at radiation safety concerns. So it was not preempted. But the case- this case, I would submit to you, at least in my experience, comes in a unusual posture because the key elements of our preemption claim are not disputed by the state. Our preemption argument is simply that Virginia's ban on uranium mining is grounded in radiation safety concerns, but not concerns related to uranium mining qua mining. Rather, the concerns at the root of the ban are radiation safety concerns related to the milling and the tailings management process resulting from that milling. The state doesn't dispute that those issues, Judge Harris, that is, activities relating to milling and to tailings management, are within the exclusive reserve powers of the NRC. Nor has the state ever disputed our assertion, which is at the core of this case, that the predominant purpose, and it's purpose that governs preemption, remember, the predominant purpose of the state's ban on uranium mining is to protect against radiation hazards of the milling and the management of the tailings. Can I ask you a question about purpose? I normally with economic- I know you cited a lot of civil rights cases in your brief. A lot of what? Civil rights cases where heightened scrutiny applies. But usually when we're dealing with economic legislation and we're interested in purpose in the preemption context, isn't it usually- isn't the inquiry less about subjective motive and more about kind of rational basis? Has the state identified a legitimate concern of state regulation? And here that would be mining. And then is the regulation sort of reasonably related to that concern? And if something fails rational basis review, then we start to worry about motive. But we don't usually go straight for motive. Your Honor, it is motive. It is purpose in the civil rights- Right, and heightened scrutiny applies in that area. But this is just regular economic regulation. But- Why would we be applying the civil rights rules here? Your Honor, the one thing that is- I would submit to you very clear is that the search for purpose engaged in by PG&E, the court in PG&E, and every single case in the line of PG&E, every single one, was not- did not rest on some rational basis notion that if there is a conceivable purpose to the court or if the state advances some rational basis that's plausible, we will accept that. And to the contrary, Your Honor, I want to specifically focus your attention on the Entergy case. The most recent case- Can I go back to Pacific Gas? Because the court, I take your point, the sort of what they mean by purpose, what the court meant by purpose is maybe not spelled out as clearly as it might have been. But the one thing the court is clear about is we will not become embroiled in attempting to ascertain California's true motive. For all the reasons we always say. It's very hard to figure out the motive of a collective body. It's too easy to fake. So they seem not to be doing the kind of analysis, at least they disclaim any interest in doing the kind of analysis that you're urging on us. Well, Your Honor, then look at the analysis they actually did. They actually examined the arguments advanced by those who said the purpose was economic or was radiological, and they went through them one by one, rejecting them as either implausible or illegitimate. Are you referring to materials now- I'm sorry? Outside of the complaint? I'm referring to the PG&E case. Okay. And yes, there were materials- I just want to make sure I'm following you. Go ahead. There were materials outside the complaint. And in fact, one of the key elements of that search was a legislative report, the key legislative report of the California Assembly that indicated the economic-based concerns, the non-safety-based concerns of the nuclear fuel cycle. And so it was that search. And Your Honor, again, I want to come back to the second case, the Entergy case, where this question, this very question, was addressed very specifically by that panel. And they said specifically, our inquiry does not end with the text of the statute. We do not blindly accept the articulated purpose of a state statute for preemption purposes. And there, Your Honor, the legislature very carefully articulated on the face of the statute purposes that it wanted to disguise its true purpose, because it knew that it would be preempted if its true purposes came forward. And the court said, you can't let a legislature do that. And they spoke to rational basis. They said, this is not a rational basis review. Requires us to conduct a more searching review to determine whether a statute was enacted based upon radiological safety. I do understand sort of how you can look at all of these cases and think that when a state is clearly, obviously purporting to regulate something that is outside its jurisdiction, unless it is regulating it for non-safety reasons, you would have to look a little bit harder at purpose. But here, this is a regulation of mining, which states are allowed to regulate. So I guess I just don't understand why any degree of skepticism is called for. They're not, on its face at least, they are regulating something that is not given exclusively to the jurisdiction of the federal government. Your Honor. And if it's not irrational, I just don't understand why. That argument offered by the state reminds me of when I was honestly 16 year old. And when my father said to me, yes Chuck, you can borrow the family car this weekend, but you can't borrow the keys. Your Honor, the whole purpose, again, his purpose wasn't that the keys were dangerous. It was that the car was. And our submission to you, and the state has never denied it, is that the purpose here, that's our complaint in allegation after allegation. And 700 pages, Your Honor, of evidence of that purpose were put in the record of this case. And so it is our submission to you that you have to consider this case as though the statute expressly read that it was the purpose of the General Assembly to ban uranium mining until such time as the General Assembly concluded that there were no significant radiological risks from milling and tailing. That's the statute really that's in front of you. There's no dispute on that from the government. What they do say is that purpose is essentially irrelevant. Purpose is irrelevant because, I guess, on the face of the statute, the only thing referenced is uranium mining and uranium mining we haven't contested. Uranium mining is within the, let's just say for purpose of this argument, we haven't contested it, we don't agree, but we're agnostic on whether uranium mining is within the exclusive regulatory authority of the state. But that doesn't mean purpose goes out the window. Pacific Gas and Electric makes clear that purpose is the inquiry here. Pacific Gas, the state was facially regulating something that is within the jurisdiction of the NRC. That just seems like a very different circumstance. Your Honor, and- The question wasn't what are they regulating. In Pacific Gas, under the statutory structure, the question had to be, we all agree, they're regulating nuclear power plants. Under the statute, they can only do that for a non-safety related purpose. So that at least raises the question of purpose, however it's to be answered. But here, the state is regulating mining that is not within the jurisdiction of the NRC. They are free to regulate it for any reason they want. Why does the purpose matter? Well, Your Honor, because if their regulation of uranium mining is, in fact, a de jure regulation and their de facto purpose is to prevent radiation hazards from milling and tailing, I think everyone would agree. I agree. That's preempted, surely. But we're in this normal category now of economic legislation. There's no reason for particular skepticism. Maybe your position is that it is absolutely, there is no rational relationship between mining per se and the purposes the state is actually claiming it has here. No rational relationship between mining, which is an antecedent of this, to the events that we say are the- No, no, no, no, I'm sorry. No, I'm sorry, you've misunderstood this. This was supposed to be a softball question. Maybe your argument is, this is just facially irrational. It doesn't make any sense to go after the mining. That fails rational basis. Your Honor, that's not my argument, but I'm happy to advance that argument because this isn't economic regulation. There's just simply no doubt that it was radiation hazards that were at the heart of the decision to ban uranium mining. It wasn't an economic- Versus civil rights. Yeah, and Your Honor, I want to come to this point, and I regret that this hasn't been in the briefing of either side until now. But this notion that the only thing on the face of this statute is uranium mining. That's simply not the case. When the uranium mining ban was enacted in 1983, there were two sections of the same measure, enactment, passed. Not only was there 45.1-283, which contained the two-sentence ban. There was 285.1-2, excuse me, 45.1-285. And it's in pages of the joint appendix 57 through 61. That section of the same enactment actually established the uranium administrative group. And its purpose was to oversee and report to the assembly on studies designed to evaluate radiation. Mr. Cover, you can keep arguing if you want to, your time's up. And if you want to take this time off your reply argument, you can keep arguing, or you can stop. Thank you, Judge Traxler. If I could finish this one point, then I will. Take the time off. Of course, of course. Thank you, Your Honor. This particular provision, enacted as part of the same enactment by the General Assembly, establishes a uranium administrative group, and its purpose was to organize and oversee studies of uranium development. And it's clear from that, and I would refer Judge Harris, you and the other members of the court, to JA page 60, because it's clear from that several pages that uranium milling and tailings management, which are defined terms in that section of that act, were overriding concerns of the legislature. So we don't have a situation, as the state has suggested, and that it's amici have even more thoroughly argued, where we just have a two-sentence enactment, and you can't discern anything about milling and tailings. That's simply not the case. Milling and tailings were overriding concerns. And that's true also, Your Honor, we've met from the 700 pages of summary judgment evidentiary support that are in the record before you. And thank you, Judge Tratchler. Thank you, Mr. Cooper. Mr. Raphael. Good morning, and may it please the court. Stuart Raphael for the Virginia State Official Appellees. This is here on a 12B6 grant, and the district court's non-preemption finding was right for four reasons. Number one, the Atomic Energy Act has never regulated conventional uranium mining on non-federal land. Number two, the radiological purpose test on which plaintiffs rely in section 2021K was simply intended to let states regulate NRC regulated activities, if the states were regulating those activities for non-radiological purposes. Nothing in the act was intended to preempt activities of the states that weren't regulated by the NRC. Third, the appellants have no limiting principle at all, to Judge Harris's point, about why their rule wouldn't extend to other radiological things that the states regulate. And fourth, any doubt about the construction of the term activities in the statute has to be resolved against preemption. So let me begin with what I think the plaintiffs only really grudgingly concede, and you saw this in Mr. Cooper's argument. But it's absolutely clear that conventional uranium mining is not regulated, it's not a field regulated by the act. What do you mean by conventional mining? That means either open strip mining or the kind of mining that you would think of going, you know, digging, that sort of thing, as opposed to in situ leach recovery, where chemicals are used to actually dissolve the uranium at the source where it is and separate it from the ore. So is the refinement of the ore on-site or off-site a relevant factor in determining whether or not it's conventional or not? I think the answer is no. If it's leach mining where you're using the solutions to dissolve the uranium, the NRC does regulate that because that actually combines the mining and the milling into one single process. And so the NRC does regulate that. And if they wanted to use in situ mining, I think we would be here saying that, no, Virginia could not regulate that for radiological purposes. But conventional mining on non-federal land is plainly not within the scope of the act. We cited the statute itself, 2092, which says that the commission can't even require a permit until ore is removed from its place of deposit in nature. The NRC, the Atomic Energy Commission before it, and EPA all have conclusively ruled that the act does not cover conventional mining. The NRC ruling is in their NRA Hydro Resources opinion in 2006, but there's a long line of authority by the commission before that. I'm sorry to interrupt again, but I might forget my question. Yes, sir. Is it your position that even if it's agreed or conceded by you that purpose of the Virginia law was based on radiological concerns, that that still does not prevent you from prevailing? Yes, and the reason is that we assume for sake of our 12B6 motion that everything they said in the complaint is true. So we're assuming that, as they allege, that the ban was enacted out of concerns about radiological safety, whether it's the safety of the miners and the raw ore or whether it's the safety of millings and tailings facilities. But I think the preemption analysis depends on two things. Number one, does the state action directly and substantially regulate an NRC-regulated activity? And if it does, then number two, is it for a radiological safety concern? And I don't think, you know, if I could go back and redo our brief, I think I'd emphasize more that first prong, the direct and substantial effect. That comes from the English case, which is the third Supreme Court case in that trilogy. And what the Supreme Court said in English is that it's okay if a state regulates even within the nuclear safety field, as long as it does not have a direct and substantial effect on the NRC activity. And English and Silkwood are really good examples of that. Silkwood is probably the best example, because in that case, the estate of Karen Silkwood recovered a $10 million punitive damage award because of safety violations. And the company said, well, that's plainly within the regulated field. It absolutely was. But is that, and that's true even if, as Mr. Cooper seems to suggest, the legislature was clear that the concern was the byproduct of mining within the state, that is tailings and millings, which clearly, I think, would be outside the ability of regulating if you got that far. For safety concerns, that's right. He's citing, there's the moratorium and then there's the separate statute that created a study group. And I think he overstates what that statute says. It does mention milling and tailing, but it also mentions concerns about uranium mining. But we obviously are assuming for purposes of our 12B6 motion that this act was designed to regulate for radiological safety concerns. Their main theory about how conventional uranium mining gets to milling and tailing is that if you don't have the ore, well, then you can't really process it at a milling or a tailing processing center. That is not a direct effect. At best, it is indirect. And just like in Silkwood, where there was a $10 million punitive award, right, that was clearly for safety reasons, the Supreme Court said that was not preempted. So this is not a field like ERISA preemption, where if the state does anything with regard to an employee retirement plan or employee benefits plan, it's preempted. This kind of preemption is very different, and you need to read all three of those Supreme Court cases in sequence, PG&E, Silkwood, and English. But they really establish a two-part test, which only really becomes clear when you read the last case, English. And that test is, does the state action have a direct and substantial effect on an NRC-regulated activity? If the answer is no, then even if it's within the field and for radiological safety concerns, i.e. Silkwood, it's not preempted. In this case, we have a conventional uranium mining moratorium. Assuming for the sake of argument that it was enacted for radiological safety concerns, it's not preempted because it doesn't have any direct and substantial effect on an NRC-regulated activity. And that brings me to Section K, 2021K. That section was simply intended to allow the states to regulate NRC-regulated activities for non-radiological purposes. And the key sentence on this is from the case, their main case, PG&E, at page 209 to 210. And we cite this in the brief. But the Supreme Court said, Congress made clear that the section, 2021, was not intended to cut back on preexisting state authority outside the NRC's jurisdiction. It was not intended to cut back on preexisting state authority outside the NRC's jurisdiction. Before 1959, when that section was added, and after 1959, the states have always regulated conventional uranium mining. Section K is a savings provision. It starts by saying, nothing in this section, that's referring to 2021, shall be construed to affect the authority of any state to regulate activities for purposes other than protection against radiation hazards. So nothing in that section preempts the state's ability to regulate NRC-regulated activities. And there are two key provisions in 2021. Section B says that the NRC can delegate its authority to regulate source, byproduct, and special nuclear materials to the states if they meet certain standards. They can delegate that. And once they do, the NRC stops regulating, and the states regulate those things for radiological safety reasons. Subsection C then says, there are certain activities the NRC cannot delegate. And those are the big-ticket things, like the licensing of a nuclear facility, the operation of the facility, and the disposal of nuclear waste. So given that framework, you need subsection K to say, nothing in that section in 2021 prohibits the states from regulating NRC activities for non-radiological purposes. And that's why California, even though it effectively banned the construction of a new nuclear plant, because it was doing so for economic reasons, not safety reasons, it was allowed to do that. Judge Harris, to your point, the distinction is that there was a direct and substantial effect on an NRC-regulated activity, and that's why it would have been preempted had it been for safety reasons. The Entergy case that they rely on, same thing. There, the Vermont legislature basically blocked the operation of the Vermont Yankee Nuclear Power Plant for safety reasons. Again, a direct and substantial effect on an NRC-regulated activity. He didn't mention Skull Valley, but I think that's probably the case on which they put the greatest reliance. And in Skull Valley, you had a private company that wanted to dispose of spent nuclear fuel on an Indian reservation in Utah, and it applied to the NRC for a permit to do that in 1997. Well, beginning from 1998 through 2001, the Utah legislature passed a whole series of laws designed specifically to block that facility. It said you couldn't have any SNL disposal facility without the approval of the governor and the legislature. It required that railroad grading crossings permits be approved, which were needed for getting trains to that facility. Those had to be approved by the governor and the legislature. It required the company to post a $5 million application fee for permission to build the facility. It required the same company to post a $2 billion bond to cover the risks of a release. And on top of that, they had to pay 75% of the state's estimate of the cost of an accidental release. It eliminated liability protection for the shareholders of the company. And then the last piece of it, on which that's the only thing they focused on, the last piece of it was it basically nationalized or state-ized the roads leading to the Skull Valley Reservation and gave control over those roads to the governor and the state. And so the Tenth Circuit said, quite understandably, this was plainly designed to block this facility. And Skull Valley uses that quote I mentioned from English. It said that had a direct and substantial effect on the operation of an NRC-regulated activity, and that's why it was preempted. The state actually sought cert in that case. The United States Supreme Court asked for the views of the government. The government said that's preempted because the clear purpose and effect of the legislature there was to block an NRC-regulated activity for radiological safety reasons, and that had a direct and substantial effect on the activity. I seem to recall that there was an argument in these papers that, at least from a national perspective, this ban on uranium mining was bad public policy. If the federal government agreed with that, what would be its options with respect to that? Well, I guess a couple things. First, if the NRC really thought that Virginia was doing something improper here, it could revoke the Discontinuance and Assumption Agreement. A violation of 2021, that statute, according to the assignment agreement, allows the NRC to revoke it. Number two, if the federal government thought that the states were blocking the creation of uranium ore, the extraction of uranium ore, they could amend the statute. But again, remember, there are two different kinds of mining. There's in situ, which the NRC does regulate, and we couldn't block that, even if it was for radiological safety concerns. And there's conventional mining, which has never been regulated by the NRC or the Atomic Energy Commission. And when you go back and you look at the history of the original statute and all of the legislative history since then, it's plain that Congress didn't expect to get into the field of mining. The federal interest attaches after the ore has been extracted and when it's being processed. And that goes back to the very first Atomic Energy Act in 1946. The plaintiff's position has no limiting principle. If you read activities as they do in Section 2021K to mean any activities of the states, well, then we couldn't regulate the possession of radiological weapons. Virginia has a statute, 18.2-52.1, that prohibits people, quite sensibly, from having radiological weapons. Well, that's clearly for radiological safety concerns. According to Mr. Cooper, we couldn't regulate that. The Pharmacy Board regulates prescription drugs that have radioisotopes in them, radiological materials. The Department of Health regulates and has provisions for responding to radiation emergencies, plainly for radiological purposes. The Board of Health licenses radioactive materials and devices, including things used in x-rays and radon screening companies. All of those regulations are plainly for radiological purposes. Why aren't they preempted? Number one, because the NRC does not regulate those activities, just like it does not regulate uranium mining. Well, suppose a state, hypothetically, was so afraid of nuclear power that it wanted to ban x-rays and radon screening companies, and it was because of their fear of nuclear energy. Under his theory, that would be preempted. That's crazy. That makes no sense. When you take a step back and you look at the way the statute is structured, and again, preemption depends on pointing to a statutory text with which this action conflicts. When you look at the way the statute is structured, the whole point of it is that either the feds or the states will regulate the activity. If it's under Section 2021, if it's source materials or byproducts, the NRC presumptively regulates that, but can delegate its authority to the states. And then the NRC stops regulating those things. For nuclear power plants and nuclear fuel disposal, only the NRC can regulate that. That's it. Nothing in the Act goes beyond that. And the quote I read you from PG&E makes that absolutely clear. Nothing in the 1959 amendments was intended to extend preemption beyond the field regulated by the NRC. I've talked about why Entergy and Skull Valley are distinguishable. I think if you were to do a grid in trying to catalog the cases, which is something I did preparing for this argument, if you put purpose, radiological purpose at the top, and you put direct and substantial effect on the left, you would be able to put into categories all of these cases. So in the top left where you have a state acting for radiological purpose and having a direct effect on an NRC regulated activity, you would put in that box Entergy, Skull Valley, northern states, the Minnesota case where Minnesota was more strictly regulating the disposal of nuclear fuel. All those things were preempted because the states had a direct and substantial effect on the regulated activity and it was for radiological purposes. You've taken a breath, so I'm going to take it back. All right. Yes, sir. If you have to concede, and you do, since it's a 12B6 motion, the truth of the allegations that are made in the complaint, and the complaint alleges that this law was grounded in radiological safety concerns, and then I look at the Pacific Gas case where they say, the Supreme Court says, the federal government has occupied the entire field of nuclear safety concerns except for limited powers expressly ceded to the states. How do you get around that? Because you have to read it in context. It's not talking about all nuclear concerns because if that were the case, then you would have preemption of, you know. They said they preempted the entire field of nuclear concerns. But it's in the context of the construction of a nuclear power plant, and you can't read PG&E in isolation. You've got to read Silkwood and English, and those were cases where if the premise of your question is, this is really strict field preemption, then English and Silkwood would have come out the other way because both of the state actions in that case were within the field, the specific field of the operation of a nuclear facility, and yet the Supreme Court said they weren't preempted. Why weren't they preempted? Because the state action there did not have a direct and substantial effect on the NRC-regulated activity. So you're right about that sentence in PG&E, but I think it would be a mistake to overread it and to say it means that the preempted field extends to things beyond what the NRC regulates. And really the saving sentence is the one that I read at the outset at page 209 to 210 where the same court said, Congress made clear that Section 2021 was not intended to cut back on preexisting state authority outside the NRC's jurisdiction. Right? So that's the limiting principle. It's got to be something within the NRC's jurisdiction. If there's any doubt about how you construe activities, and we argue, you know, we have the statutory disagreement about what activities means in 2021-K. We say it clearly means NRC-regulated activities. They say it means all state activities. If you have any doubt, you've got to resolve that doubt against preemption. And that's PG&E, Silkwood, and English, all three of those cases, applied that presumption against preemption, and there was no preemption in those cases. In PG&E, it's at page 206. In Silkwood, it's at page 256. In English, it's at page 80. I'd also mention that this Court's decision in CTS v. Waldberger, which was reversed, the panel's decision was reversed by the U.S. Supreme Court in that case. Fortunately, none of you was on the panel on that case, but the majority said that the issue there was whether CERCLA preempted Maryland's statute of repose. It happens to the best of us. Yes, sir. And Judge Thacker wrote in dissent, well, the statute doesn't use the term statute of repose, so it's not preempted. The majority said, well, the purpose of CERCLA is to really block these inconsistent state rules, so it is preempted. Judge Thacker was right. The Supreme Court reversed and applied her reasoning. Where there's an ambiguity in the statute, you've got to resolve it against preemption. So even if we had this disagreement, we still win based on the presumption against preemption. The conflict preemption claim also fails. We cited the Isla Petroleum and the City of Falls Church case for the proposition that you can't have a claim of conflict preemption succeed unless there's some text with which the activity conflicts, and they haven't identified that text here. Really, the conflict preemption claim fails for the same reason as the field preemption claim, given that the states are allowed to regulate conventional uranium mining. I think their conflict preemption claim is really no better than the claim that was rejected in PG&E, where the plaintiffs argued that there was a policy preference in favor of nuclear, and the Supreme Court said, well, but the Atomic Energy Act does not promote nuclear at all costs. It's got lots of ways where the states can regulate, and just because it doesn't lead to a nuclear, you know, pro-nuclear outcome doesn't mean there's conflict preemption. It's the same exact argument in this case. So in summary, the field preemption under the Atomic Energy Act is really limited. Even inside the preempted field, like the construction of reactors, states can regulate for non-radiological purposes, and also if there's no direct and substantial effect on NRC-regulated activities outside that field, they can regulate for any purposes, including radiological safety concerns, and that's why the district court correctly granted our 12B6 motion you should affirm. Thank you. Thank you, Mr. Raphael. I don't think I've ever heard anybody get as much argument in 20 minutes as you did. All right, Mr. Cooper, you have some time to reply. Yes, Your Honor, I can't possibly hope to rebut everything that Mr. Raphael just said, but I would like to focus on his principal point, it seemed to me, which is there's no limiting principle to our argument, which is the PG&E argument, that it is purpose, the purpose of the state enactment, that governs the preemption question. There is a limiting principle, and it's right in 21-20-2021 itself, which is Section A.1. It is the purpose of this section to...clarify the respective responsibilities under this chapter of the states and the commission with respect to regulation of what? Not any activities. We don't really have a contest over that. Let's say it's activities expressly and exclusively within NRC's authority. We're fine with his...we accept his interpretation. Of what? Of by-product, source, and special nuclear materials. That's what...that's what 2021-K deals with and reserves to the federal government the safety regulations of Judge Traxler, and by-product materials does not include any of the parade of horribles that he's talking about. X-rays? Those are by-product materials. And so, not within the definition of the statute. That is the limiting principle. It's what the...what 2021-K... in 21-21-K says, nothing in this section shall be construed. So it's clear that that's the limiting principle, Your Honor. The other point I want to make, Judge Harris, in specific reference to one of your concerns, in the Supreme Court, in the PG&E case, addressed a similar, I believe, concern that you have raised. And it said this. It is suggested that California, if concerned with economics, would have banned California utilities from building plants outside the state, just as they say. Virginia hasn't banned milling and tailing of uranium mined from outside the state. This objection carries little force. There is no indication that California utilities are contemplating such construction. The state legislature is not obligated to address purely hypothetical facets of a problem. There's nothing more hypothetical than the notion that somebody would bring uranium mined from outside the state, and the state would be perfectly fine with that being milled and the tailings being stored here. Not only is it hypothetical, it's, with all due respect, ludicrous. The final point I want to make, or one of my final points, goes to Skull Valley. The Skull Valley case that we do place a lot of reliance on, that as well as the Entergy case, Your Honors, which, again, we think makes clear that the Court cannot, given its charge to discern the purpose of the legislation, just blindly, as the Second Circuit said, accept the face of the statute for that purpose. Particularly since we have alleged, without dispute, what the purpose was. But in Skull Valley, Utah was very careful to make sure they legislated only within those things that were at the core of sovereign police powers. Municipal services, the police protection, fire protection itself, water, garbage. I mean, if there is anything that is in the sovereign prerogatives of the state, it's that, much more so than mining of uranium. Here's what the Court of Appeals for the Tenth Circuit said, and I want to share the entire quote because it goes to the heart of this case. We disagree with the Utah officials that the law is not preemptive because it concerns areas that characteristically have been governed by the states. Although it is true that the state law addresses police, fire protection, waste and garbage collection, and other similar matters that have been traditionally regulated by local government, that fact does not trump the preemption analysis that the controlling Supreme Court decisions require us to undertake. Under that analysis, we consider the purpose and effect of the state law at issue, and as a result, a state cannot use its authority to regulate law enforcement and similar matters as a means, as a pretext, I would say, of regulating radiological hazard. Finally, 15 seconds, let me say this about the notion of the effect. In English, in English, it involved state tort law, the infliction of emotional distress on a whistleblower. The court said this is state tort law of general applicability that long predates the Atomic Energy Act. The purpose of that wasn't obviously to interfere with regulated activities, and they said the effect of that on federal reserved authorities was too indirect and speculative. There is nothing indirect and speculative about whether or not I can borrow my car if you deny me the keys. If you deny me the ability to mine my uranium, I can't mill it and I can't store its tailings, at least not in this state, and that's, and nobody would want to do anything else. Thank you so much, Your Honor. All right, we'll come out in Greek Council and then go into our next case.
judges: William B. Traxler Jr., Albert Diaz, Pamela A. Harris